IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:23cr108

JON JESSE TERRY

**MEMORANDUM OPINION**

This matter is before the Court on MR. TERRY'S MOTION TO SUPPRESS EVIDENCE (ECF No. 16) (the "Motion"). Having considered the Motion, the RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS (ECF No. 18) filed by the Government and MR. TERRY'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION TO SUPPRESS EVIDENCE (ECF No. 22), and having heard testimony and oral argument on October 31, 2023, the Motion was denied for the reasons set forth on the record and those set out below.

**FACTUAL BACKGROUND**

The factual findings are based on the testimony of the witnesses and a review of the body-worn camera footage. The camera footage confirms the testimony quite thoroughly.

At around 9:00 in the evening on May 24, 2023, two Richmond Police Officers (Officer Barnes-Christian and Officer Hunsaker) were on a "hot spot curve" patrol which is a show of police presence

in high violence and high crime areas. The area being patrolled was known as Six Points where recent armed robberies and several shootings had occurred. In addition, according to Officer Barnes-Christian, the Six Points area is home to regular random gunfire and drug activity. The area clearly qualifies as a high crime area.

To demonstrate police presence in the area, the officers parked their car near a Sunoco service station and began their foot patrol. At the Sunoco station three people were engaged in working on a moped or a motor bike of some sort. It was dark in the area and the service station was lighted. Both officers had their flashlights on. As the officers approached the service station, Officer Barnes-Christian noticed a bulge in the lower area of the defendant's hoodie around the defendant's waist. Officer Hunsaker testified that, from his perspective, he did not notice the bulge.

Officer Barnes-Christian did not say that, at that point, he thought the bulge was a gun, but he thought that it might be one.[1] He then changed location and saw the defendant from a different physical perspective. And, from that perspective, he saw an L-

---

[1] Officer Hunsaker also relocated to a position about 20-30 feet away near the service station and his attention was directed elsewhere.

shaped object in the area of the defendant's hoodie where he previously had identified the bulge.

An examination of the footage from Officer Barnes-Christian's body-worn camera confirms that there was a clearly defined, long, sagging shape paralleling the ground at the bottom of the pocket of the hoodie that was connected to a less clearly intersecting shape running vertically in the hoodie. Those shapes connected to form an "L."

At that point, Officer Barnes-Christian concluded, based on his experience and training, that the L-shaped object likely was a gun and that the defendant likely was carrying a concealed weapon. Carrying a concealed weapon without a permit is a crime in Virginia.

Therefore, Officer Barnes-Christian started a police-citizen encounter to make further inquiry and to determine whether the defendant had a permit to carry a concealed weapon. To that end, Officer Barnes-Christian said to the defendant "hey, can I talk with you," or words to that effect. That request was articulated when Officer Barnes-Christian was about four and a half feet or so from the defendant. The request was made in a conversational tone that was neither authoritative nor demanding.

The defendant immediately bolted and began to run away at a sprint pace. While fleeing, the defendant tripped and fell, but

he got up and ran in another direction. At some point during his flight, the defendant stuck his hand in the hoodie pocket. Officer Barnes-Christian caught up to the defendant and grabbed the hoodie from behind. The defendant fell to the ground. At the same time, Officer Hunsaker caught up and grabbed the defendant around his upper body. He was physically restrained and, indeed, was resisting the restraint, as the officers continued the investigation. As the defendant resisted, a gun was taken from his hand. It was determined that the defendant had no permit to carry a concealed weapon and that he was a convicted felon. He was arrested and then indicted for violating 18 U.S.C. § 922(g)(1) (possession of a firearm and ammunition by a convicted felon).

## DISCUSSION

The Fourth Amendment to the Constitution of the United States protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Thus, as a general proposition "law enforcement [officers] must obtain a warrant, grounded in probably cause before seizing or searching individuals." United States v. Harris, No. 3:21cr18, 2021 WL 2384554, at *3 (E.D. Va. June 10, 2021) citing United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2023).

There are, however, several exceptions to the warrant

4

requirement. United States v. Currey, 965 F.3d 313, 321 (4th Cir. 2020). And, it is settled that the Fourth Amendment is not implicated in what is commonly referred to as a "police-citizens encounter," where a law enforcement officer simply approaches a person in a public place and speak with him or her and asks the person to answer a few questions. Florida v. Bostick, 501 U.S. 429, 439-40 (1991); United States v. Lewis, 606 F.3d 193, 197-98 (4th Cir. 2010). However, the Fourth Amendment is implicated when an individual has been "seized" that is, when the subject is no longer "free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1998); United States v. Mendenhall, 446 U.S. 544, 553-54 (1980).

A law enforcement officer may stop and briefly detain a person for investigative purposes when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); Terry v. Ohio, 392 U.S. 1, 30 (1968). If such reasonable suspicion exists to conduct an investigative stop, and the officer reasonably believes that the defendant may be armed and dangerous, the officer may conduct a frisk and limited search for weapons to assure the officer's safety during the detention. United States v. Hensley, 469 U.S. 221, 226-28 (1985); United States v. George, 732 F.3d 296, 299-302 (4th Cir. 2013); United States v. Black, 525 F.3d 359, 365 (4th Cir., cert. denied, 555 U.S. 875 (2008) (approving stop and

5

pat down frisk based on reasons of suspicion that the defendant had a firearm concealed in his pocket).

Whether there is reasonable suspicion to believe that criminal activity is, or may be, afoot depends upon the totality of the circumstances. That includes the information known to the officer and any reasonable inference that can be drawn at the time of the stop. United States v. Arvizu, 534 U.S. 266 (2002); United States v. Coleman, 18 F.4th 131, 136 (4th Cir. 2021). The Fourth Circuit has explained that reasonable suspicion is "a common-sensical proposition . . . crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). On that point, the Supreme Court has instructed that law enforcement officers are permitted "to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well allude an untrained person." United States v. Arvizu, 534 U.S. at 273.

And, because the intrusion effectuated by an investigative stop is a minimal one, the reasonable standard has been described as "not onerous." United States v. Gutierrez, 963 F.3d 320, 334-36 (4th Cir. 2020). That said, an officer's reliance on a hunch is insufficient to establish reasonable suspicion. United States

6

v. Arvizu, 534 U.S. at 274.

Courts have considered the following circumstances [among others] when determining whether officers had reasonable suspicion to detain a suspect: (1) presence in a high crime area; (2) evasive conduct; (3) furtive behavior; and (4) observation by law enforcement [officers] of what appears to be criminal activity. United States v. Smith, 994 F. Supp. 2d 758, 762 (E.D. Va. 2013). The lateness of the hour[2] and evasive conduct[3] also are factors that are appropriate for consideration as contributing to the reasonable suspicion that criminal activity is, or is about to be, afoot. The confluence of the relevant factors is generally sufficient to establish a reasonable suspicion that criminal activity is afoot; and that is sufficient to support a Terry stop. United States v. Black, 525 F.3d at 365-66; United States v. Mayo, 361 F.3d 802, 804-07 (4th Cir. 2004).

Applying these factors here, it is apparent that the seizure of both the defendant and the weapon that he had concealed in his pocket and that was disclosed when Officer Barnes-Christian ended the defendant's flight was lawful. A brief recounting of the evidence here explains why that is so. At approximately 9:00 p.m.

---

[2] United States v. Lender, 985 F.2d at 154.

[3] United States v. Smith, 396 F.3d 379, 585-87 (4th Cir., cert. denied 545 U.S. 1122 (2005)).

7

on May 24, 2023, when it was dark, Officers Barnes-Christian and Hunsaker were on patrol in a district they knew well. The officers were in the Six Points area which to them was known as a high crime area. Both testified that it was a high crime area known for violence and drug trafficking activity as well as the presence of firearms and gunfire. Indeed, in recent weeks there had been two armed robberies and several shootings in the area. The officers were on what is referred to as a "hot spot curve." That is a procedure by which the officers assigned to a particular area, with which they are familiar, establish a police presence that is intended to deter criminal activity in designated and known high crime areas.

As was the proscribed mode of operation for a hot spot curve patrol, the officers parked their car and began to patrol on foot. While on foot patrol, they approached a Sunoco service station where they observed three young men apparently ministering to the tire of a motor bike or moped. As the officers approached, Officer Barnes-Christian noticed a bulge in the pocket area in the lower part of the pink hoodie being worn by the defendant. Officer Barnes-Christian then relocated so that he was better able to see while Officer Hunsaker moved up toward the service station and away from the young men.

8

After Officer Barnes-Christian relocated, he saw that the previously noticed bulge actually formed the shape of an "L" which, in his experience and training, was that of a pistol. He then determined, again based on his training and experience, that it was likely that the defendant was in possession of a concealed weapon, which is a crime under Virginia law, unless the possessor has a concealed-carry permit.

If appropriate credit is accorded to Officer Barnes-Christian's experience and training, and credit is given to the inferences from the deductions about the information that was available to him (information that might well allude an untrained person), Officer Barnes-Christian had reasonable suspicion that criminal activity was afoot: carrying a concealed weapon without a permit. That conclusion warranted further inquiry.

And, indeed, Officer Barnes-Christian decided that further inquiry was needed to determine whether the defendant had a permit to carry a concealed weapon. That inquiry began when Officer Barnes-Christian said "hey, can I talk with you" (or words to that effect) as he took a step or two toward the defendant who, at the time, was taking a step or two away from where Officer Barnes-Christian was located. This request was neither demanding nor authoritative in tone. But, immediately upon hearing the request, the defendant bolted and fled on foot, rapidly moving away.

Officers Barnes-Christian and Hunsaker gave chase and began to gain on Terry. At some point during the chase, the defendant put a hand in the pocket of his hoodie. He tripped and fell. Then he got up and began to run in another direction at which time Officer Barnes-Christian grabbed the back of the defendant's hoodie which brought the defendant to the ground. At that time, Officer Hunsaker caught up and, using both arms, encircled the defendant's upper body. At the time, the defendant was resisting and his hand was in the pocket of his hoodie (where he had placed it during flight). During the resistance, Officer Barnes-Christian saw a gun in the defendant's possession and called an alert using the word "gun." Almost immediately, the gun was taken from the defendant's possession and it then fell to the ground.

Thus, what began as a police citizen encounter for the purpose of asking a question, turned immediately into a flight, a pursuit, and the termination of pursuit at which time the defendant was detained, and later was arrested. The weapon at issue was seized immediately at the last phase of the pursuit of the fleeing defendant.

Applying the basic principles that govern <u>Terry</u> stops, several factors animated the existence of reasonable suspicion sufficient to effectuate the stop: (1) presence in a high crime area; (2) the evening hour; (3) observation by a law enforcement

10

officer of what appeared to be criminal conduct based upon the officer's experience and training; and (4) evasive conduct in the form of flight. Factors (1), (2), and (3) provided reasonable suspicion that criminal activity of possession of a concealed weapon was afoot and that was confirmed by factor (4), unprovoked flight following a request to talk. On the basis of that evidence, the officers were justified to give chase to the defendant so as to determine whether the reasonably suspected activity was occurring. The weapon became apparent when the officers were detaining the defendant while he was resisting the detention. The officers had the right to protect themselves by seizing the weapon. All of that was lawful under Terry v. Ohio and its progeny.

## CONCLUSION

For the foregoing reasons, MR. TERRY'S MOTION TO SUPPRESS EVIDENCE (ECF No. 16) was denied.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 3, 2023